
FILED

NOV 3 0 2017

Clerk, U.S District Court
District Of Montana
Missoula

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| LAURIE RUFFNER, <br><br> Plaintiff, <br><br> vs. <br><br> KEN BLANCHARD COMPANIES, INC., <br><br> Defendant. | CV 16–109–M–DWM <br><br><br> ORDER |

In June 2016, Plaintiff Laurie Ruffner ("Ruffner") sued her former employer, Ken Blanchard Companies, Inc. ("Blanchard"), in the Montana Twenty-First Judicial District Court, Ravalli County, alleging wrongful discharge from employment (Count I) and interception of wire and electronic communications (Count II). (State Compl., Doc. 3.) In August 2016, Blanchard removed the action to this Court, (Doc. 1), and Ruffner subsequently amended her complaint to proceed solely on a claim for wrongful discharge under the Montana Wrongful Discharge from Employment Act, MCA §§ 39-2-301, *et seq.* (*See* Amend. Compl., Doc. 28). Blanchard seeks summary judgment. (Doc. 25.) After considering the parties' briefing and oral argument, the motion is granted.

1

## BACKGROUND

The facts as outlined below are undisputed, (*see* Fact Statements, Docs. 27, 38), or viewed in the light most favorable to Ruffner, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam).

Blanchard is a management training and consulting firm. Ruffner was employed at Blanchard from approximately June 16, 1996 until April 18, 2016. Her last position was Director of Client Solutions. In that position, Ruffner's job responsibilities included sales for Blanchard's products and services and related customer service and account management duties. During her twenty years, Ruffner was an exemplary employee who routinely received positive feedback on her performance. However, Ruffner did not meet her annual budget sales revenue goal for 2012, 2013, and 2014. In April 2015, she was not on track to meet her 2015 goal. At that time, Gina Crosby, Ruffner's direct manager, instructed her to develop a 90-day account development plan in order to achieve or exceed her annual revenue goal. Ruffner was not the only employee to miss her sales goals nor the only employee required to prepare a 90-day plan.

Although the parties dispute whether Ruffner ultimately met her 2015 goal, on January 27, 2016, Crosby and Felicia Davey, Senior Human Resources Director, presented Ruffner with a performance improvement plan ("PIP") that

addressed her failure to meet revenue goals in previous years and identified other areas in which Crosby believed Ruffner needed to improve. Ruffner was the only employee to receive a PIP, despite the fact that four of seven other employees in Ruffner's position failed to make their annual revenue goals for 2015. Because of Ruffner's tenure with the company and Blanchard's concerns, Blanchard gave her the option of severance pay if Ruffner did not want to meet the requirements of the PIP. At the end of the January 27 meeting, Davey told Ruffner to take the next couple days off to consider her options, which Ruffner did. Due to the timing of this conversation, Ruffner did not attend the All Sales Meeting, which began the following Monday. At that meeting, employees gossiped about the status of Ruffner's employment.

On January 29, 2016, Ruffner communicated to Mark Manning, Senior Vice President of Sales, North America, and Davey that she disagreed with the PIP and, at the same time, made a counteroffer as to severance. On February 4, 2016, Manning sent Ruffner an email supporting the PIP and indicating her severance request was too high. Ruffner responded that she did not oppose a PIP, but believed "the one presented was set up for failure" and she was "not opposed to a plan that is reasonable, allows [her] to serve [her] clients and is obtainable." (Doc. 38, ¶ 20.) Blanchard allowed Ruffner to remain on administrative leave through

March 11, 2016, while she reviewed a subsequent severance offer. On March 8, 2016, Blanchard received a letter from Ruffner's attorney with another counteroffer to Blanchard's proposed severance agreement, and on March 9, 2016, Ruffner asked for additional time off through March 16, which was approved.

On March 10, 2016, Blanchard sent a letter to Ruffner's attorney indicating she should plan to return to work on March 16. On March 16, Ruffner's attorney sent Blanchard a letter stating Ruffner would not return to work unless several conditions were met. Those conditions were that: (1) the PIP be removed, (2) her accounts returned to her in the same form they existed prior to her leave, (3) her 2016 quota adjusted from $1.6 million to $1.4 million, (4) management correct an issue related to employees stating Ruffner had been terminated, (5) she be trained in certain processes and procedures for newly launched system, (6) Blanchard not adjust, change, alter, or remove any of her sales territory in any way, and (7) Blanchard pay for all client-related travel expenses. On March 18, Blanchard responded, stating that Ruffner could return to work on March 21 and that it was willing to meet most of her conditions, except a PIP would remain in place and it could not guarantee her client list indefinitely. On March 21, Ruffner's attorney rejected Blanchard's offer, demanding the PIP be removed and seeking other clarification. Blanchard responded on March 24 with further clarification and

indicated that Ruffner would need to return to work after March 31. On March 30, Ruffner's attorney once again rejected Blanchard's offer, writing, "Ms. Ruffner will return to work on the condition there is no PIP." (Doc. 38 at ¶ 33.)

While Ruffner was on leave, service to her client accounts was disrupted and other Blanchard employees were burdened with handling her accounts in addition to their own work. On April 8, 2016, Blanchard sent another letter to Ruffner, explaining:

> I understand you have stated that you will not return to work under any type of PIP. As an extraordinarily unusual accommodation to you, we will hold in abeyance the PIP that was previously provided to you, with the understanding a PIP will be put in place no later than May 1, 2016. Please know that we intend to work with you in good faith, with the assistance of an internal Executive Coach, to make some adjustments to the PIP, including the revisions we have already told you we would do, so that you feel better about it.

(Doc. 38-15.) The letter also states, "If you do not return to work on Monday, April 18, 2016, we will consider you to have voluntarily resigned your position." (*Id.*) Ruffner did not return to work by April 18, effectively ending her employment. In 2015, Ruffner's salary with Blanchard was $134,510.00.

Since her employment ended, Ruffner applied for and accepted only one position, a part-time executive director position with the Bitterroot Performing Arts Council, earning $26,000 per year, which she started June 13, 2016. Ruffner

did not look for any jobs comparable to the position she held at Blanchard.

## SUMMARY CONCLUSION

Although the amended complaint adequately pled constructive discharge as to put Blanchard on notice, Ruffner's claim fails on the merits of the undisputed facts. Additionally, Blanchard has shown that it had good cause to terminate her employment as a matter of law and Ruffner does not present a pretext argument. Consequently, summary judgment is appropriate, and it is not necessary to address the parties' mitigation arguments.

## LEGAL STANDARD

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248.

## ANALYSIS

Blanchard argues that Ruffner can show neither that she was constructively

discharged nor that it lacked good cause to terminate her employment. Because the undisputed facts demonstrate Blanchard is correct on both points, summary judgment is appropriate.

I. **Constructive Discharge**

In most cases under Montana's Wrongful Discharge Act, "the situation presented is one where the employment was actually terminated by the employer." *Jarvenpaa v. Glacier Elec. Coop.*, 898 P.2d 690, 692 (Mont. 1995). The Act, "however, also allows for those situations in which the employer has made working conditions so intolerable that the employee is forced to quit—i.e., a constructive discharge." *Id.* Montana law defines constructive discharge as "the voluntary termination of employment by an employee because of a situation created by an act or omission of the employer which an objective, reasonable person would find so intolerable that voluntary termination is the only reasonable alternative." MCA § 39-2-903(1). Whether constructive discharge occurred is "usually a question of fact determined by the totality of the circumstances." *Bellanger v. Am. Music Co.*, 104 P.3d, 1075, 1078 (Mont. 2004). "Summary judgment should not be awarded when a factual controversy exists; whether an employer's actions are wrongful and caused a plaintiff's resignation is generally 'for the trier of fact to decide.'" *Id.* (quoting *Jarvenpaa*, 898 P.2d at 694).

7

Here, there are two issues related to constructive discharge; the first is whether it was adequately pled, and the second is whether the facts alleged fail to show constructive discharge as a matter of law.

### A.     Pleading

In a civil action, the Federal Rules of Civil Procedure require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Although the rule encourages brevity, the complaint must say enough to give the defendant 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)). A complaint need not identify the "precise legal theory" nor include an "exposition of [the plaintiff's] legal argument." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011).

Here, Ruffner's Amended Complaint does not mention constructive discharge and takes the position that Blanchard terminated Ruffner, not that Ruffner voluntarily resigned. It states that "[o]n April 19, 2016, Blanchard terminated Ms. Ruffner's employment without explanation or good cause, instead mischaracterizing the termination as a 'voluntary resignation.'" (Doc. 28 at ¶ 3(q).) And, Count One alleges: "Ms. Ruffner was terminated in violation of the

Montana Wrongful Discharge From Employment Act, §39-2-901, et seq., MCA. Specifically, Ms. Ruffner was terminated without good cause and in violation of Defendant's employment policy." (*Id.* at 6.) However, the Amended Complaint outlines in detail the parties' dispute over the PIP and the conditions upon which Ruffner would return to work. It explains that she would not return to work under the PIP proposed by Blanchard and, as a result, was terminated. While it fails to identify the precise legal theory, it contains a sufficient "short and plain statement" to give Blanchard notice of a potential constructive discharge theory. *Skinner*, 562 U.S. at 530; *Tellabs*, 551 U.S. at 319.

**B. Facts**

Blanchard further argues that Ruffner was not constructively discharged as a matter of law. Ruffner, on the other hand, insists that her decision not to return to work under the terms of Blanchard's offer was, in effect, a forced resignation. Consideration of the totality of the circumstances here precludes a finding of constructive discharge.

Montana law provides useful guidance in the context of forced retirement. "[W]here an employer tells an employee to resign or be fired, the resignation can be a constructive discharge." *Jarvenpaa*, 898 P.2d at 692. "[T]he threshold factual issue of whether the employee's termination is voluntary or involuntary

9

should be submitted to the factfinder." *Id.* at 693. However, an offer of early retirement in lieu of termination "does not by itself constitute constructive discharge." *Id.* And, "[e]arly retirement is not a discharge if the employee has the power to choose to keep working." *Id.* If returning to work is an option, the question is whether doing so "will result in work so arduous or unappealing, or working conditions so intolerable, that a reasonable person would feel compelled to forsake his job rather than submit to looming indignities." *Id.* (quoting *Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 480 (1st Cir. 1993)).

In *Childress v. Darby Lumber Inc.*, this Court granted summary judgment to an employer under a constructive discharge theory. 126 F. Supp. 2d 1310, 1319 (D. Mont. 2001). In addressing claims under the Worker Adjustment Retraining and Notification Act ("WARN"), this Court explained:

> Determination whether conditions are intolerable is normally a question for factfinders. However, even if conditions of the reassignment from heavy equipment operator to log landing worker are viewed in a light most favorable to [the employee], it does not rise to the level of constructive discharge here. Here [the employee] anticipated that conditions would be intolerable at the log landing without ever actually arriving at the site to find out what the conditions would be. Given the range of jobs that [the employer] had remaining for its employees, reassignment of [the employee] to work at a log landing was not unreasonable. Plaintiffs note that [the employee] had safety and training concerns about working at the log landing. A reasonable alternative to quitting could certainly have been refusing to perform certain tasks until safety measures were put in place and he was given the proper training.

10

> However, [the employee] never arrived at the landing and never discovered if proper training and safety measures would be in place. A totality of the circumstances test here indicates that [the employee]'s speculation about potential intolerable situations is not enough to warrant a finding of constructive discharge. . . . Consequently, Defendants are entitled to summary judgment regarding claims of [the employee] under the WARN Act because he voluntarily departed from his employment.

*Id.* at 1319 (internal citations omitted).

The facts here are more analogous to *Childress* than *Jarvenpaa*. While Blanchard offered Ruffner a severance option, she also had the option to return to work. Ruffner must therefore raise a genuine issue of material fact as to whether doing so "w[ould] result in work so arduous or unappealing, or working conditions so intolerable, that a reasonable person would feel compelled to forsake h[er] job rather than submit to looming indignities." *Jarvenpaa*, 898 P.2d at 693 (internal quotation marks omitted). She fails to do so. Instead, the undisputed facts show that her return to work had been accommodated by her employer.

Ruffner argues that returning to work under the terms of the PIP would be so onerous as to make her job intolerable. She insists that unlike *Childress*, her knowledge of her job before the PIP makes her fear of her increased duties and job conditions under it a certainty, not speculation. But, it is undisputed that Ruffner never returned to work to assess the truth of her speculation about working under

11

the PIP being intolerable by any reasonable standard. It is also undisputed that Blanchard agreed to almost all of Ruffner's other conditions for her return to work, agreed to work with Ruffner and an executive coach to modify the PIP, and agreed to hold the PIP in abeyance. (*See* Doc. 38-15.) The "certainty" Ruffner claims ignores Blanchard's undisputed offer of accommodations. She further argues that her co-workers gossiped about her alleged termination; however, there is no indication such activity would prevent her from performing her job.

Had Ruffner returned to work, the PIP remained un-modified, her sales areas taken away, and her co-workers no longer possible to work with, her claim could have presented a jury question. But, Ruffner's speculation as to the intolerability of her potential working conditions does not raise a genuine issue of material fact as to constructive discharge. Ruffner was told she could return to work, but she chose not to. The undisputed facts, viewed in the light most favorable to Ruffner, fail to show "an objective, reasonable person would find" that her decision was "the only reasonable alternative." *See* § 39-2-903(1). Accordingly, summary judgment is granted in favor of Blanchard as to Ruffner's constructive discharge claim.

## II. Good Cause

Blanchard further insists that it had good cause to terminate Ruffner. "A

discharge is wrongful if it is not for good cause." *Davis v. State, Dep't of Public Health & Human Servs.*, 357 P.3d 320, 322 ¶ 10 (Mont. 2015). An employer has "good cause" to discharge an employee if it had "reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, a disruption of the employer's operation, or other legitimate business reason." Mont. Code Ann. § 39-2-903(5). "A legitimate business reason is one that is 'neither false, whimsical, arbitrary or capricious, and it must have some legal relationship to the needs of the business." *Becker v. Rosebud Operating Servs., Inc.*, 191 P.3d 435, 441 (Mont. 2008) (quoting *Kestell v. Heritage Health Care Corp.*, 858 P.2d 3, 7 (Mont. 1993)).[1] Summary judgment is appropriate "where there are facts *not* in dispute that provide 'good cause' for discharge from employment." *Davis*, 357 P.3d at 322. Blanchard argues it had good cause to terminate Ruffner because she failed to report for work at the end of her official leave period on April 18, 2016.

Pursuant to Blanchard's employee manual, "Blanchard will consider [an employee] to have voluntarily terminated [her] employment if . . . [she] fail[s] to

---

[1] Employers have the broadest discretion in their personnel decisions if the terminated employee is in a "sensitive managerial" position. *Buck v. Billings, Mont. Chevrolet*, 811 P.3d 537, 541 (Mont. 1991). The discretionary power outlined in *Buck* is not applicable here, however, as—despite her title as Director— there is no indication that Ruffner was a manager or that her termination was based on her role.

13

return from an approved leave of absence on the date specified." (Doc. 27-25 at 2.) Under Montana law, the failure to report for work can constitute good cause. In *Davis*, the Montana Supreme Court affirmed summary judgment in favor of an employer where the employee "repeatedly failed to report to work after her confrontation with her immediate supervisor and did not obtain an excused absence. She also refused to attend two meetings arranged to discuss her concerns." 357 P.2d at 322. The situation here is similar.

Ruffner left work in February and did not return. Blanchard approved extensions of Ruffner's leave, but ultimately set a final date upon which Ruffner was required to report for work. Ruffner did not report. As mentioned above, Ruffner's primary disagreement with Blanchard was over the imposition of a PIP. However, Ruffner does not dispute that Blanchard had the authority under its Employee Manual to institute a PIP. (*See* Doc. 38-7 at 46.) Moreover, as discussed in the context of constructive discharge, returning to work was a viable alternative. Accordingly, Blanchard had good cause to terminate Ruffner's employment when she refused to return.

### III. Pretext

Once an employer submits evidence of good cause, the employee may submit evidence demonstrating either the reason for discharge was not "good

14

cause" or that the given reason, "is a pretext and not the honest reason for the discharge." *Becker*, 191 P.3d at 443. To create an issue of fact regarding pretext, the employee must provide more than "mere denial and speculation." *Johnson v. Costco Wholesale*, 152 P.3d 727, ¶ 28 (Mont. 2007). Here, Ruffner did not respond to Blanchard's pretext argument. However, at the motions hearing, her argument veered into the land of pretext. She argued that given Ruffner's 20-year history with the company, the PIP was merely meant to "paper the file," or lay the groundwork for Ruffner's termination. Ruffner noted that after reviewing the PIP, Manning stated: "I don't believe Laurie will be able to meet your expectations even [if two requirements from the PIP are removed] and [if those requirements are removed] the plan might seem more fair and reasonable." (Doc. 38-9 at 1.) But, as conceded at oral argument, Ruffner did not and is not arguing pretext as a legal theory. Even if she wanted to, she did not address it in her summary judgment briefing, failing to meet her burden under the Wrongful Discharge Act. *See Becker*, 191 P.3d at 443. Summary judgment is granted in favor of Blanchard as to the question of pretext.

## IV. Violation of Written Personnel Policy

Although Ruffner alleges her discharge was in violation of Blanchard's employment policy, (Doc. 28 at 6), she did not respond to Blanchard's motion for

15

summary judgment as to this theory. In the absence of any argument from Ruffner, the Court cannot assess the merits of this theory as it is unclear what provision of the policy may even be at issue. (*See* Blanchard's Brief in Support, Doc. 26 at 12 (referencing imposition of the PIP) *and* Ruffner's Amend. Compl., Doc. 28 at 5 (noting that the employee manual prohibits employees from gossiping about one another).) Summary judgment is appropriate as to this issue. *Cf.* L.R. 7.1(d)(1)(B)(ii) ("[F]ailure to file a response brief may be deemed an admission that the motion is well-taken.").

## V. Mitigation

Because Blanchard succeeds on the merits of its summary judgment motion, the parties' arguments as to mitigation damages are not addressed.

### CONCLUSION

Based on the foregoing, IT IS ORDERED that Blanchard's motion for summary judgment (Doc. 25) is GRANTED. The Clerk of Court is directed to enter judgment in favor of Blanchard and against Ruffner and close the case file.

DATED this 30th day of November, 2017.

_____
Donald W. Molloy, District Judge
United States District Court